IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| MARLIN L. CRUMBLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 06-G-0601-NE |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

### MEMORANDUM OPINION

The plaintiff, Marlin L. Crumbley, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for Social Security benefits. Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. §405(g).

### STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth, at 1239..

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I). For the purposes of establishing entitlement to disability benefits, physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R.§ 404.1520(a)-(f). The Commissioner must determine in sequence:

(1)   whether the claimant is currently employed;

(2)   whether he has a severe impairment;

(3)   whether his impairment meets or equals one listed by the Secretary;

(4)   whether the claimant can perform his past work; and

> (5) whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." Pope at 477; accord Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner further bears the burden of showing that such work exists in the national economy in significant numbers. Id.

In the instant case, ALJ Earl C. Cates, Jr., determined the plaintiff met the first two tests, but concluded that while he has an impairment or impairments considered "severe," he did not suffer from a listed impairment. The ALJ found the plaintiff unable to perform his past relevant work. Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." Foote, at 1559. Furthermore, when, as is the case here, a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids). Foote, at 1558-59. The presence of a non-exertional impairment, pain, also prevents exclusive reliance on the grids. Foote, at 1559. In such cases "the [Commissioner] must seek expert vocational testimony." Foote, at 1559.

## THE STANDARD FOR REJECTING
## THE TESTIMONY OF A TREATING PHYSICIAN

As the Sixth Circuit has noted: "It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim." Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988). "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary." McGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); accord Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991). In addition, the Commissioner "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight ...." McGregor, 786 F.2d at 1053. If the Commissioner ignores or fails to properly refute a treating physician's testimony, as a matter of law that testimony must be accepted as true. McGregor, 786 F.2d at 1053; Elam, 921 F.2d at 1216. The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence. See McGregor, 786 F.2d at 1054; cf. Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987)(articulation of reasons for not crediting a claimant's subjective pain testimony must be supported by substantial evidence).

## THE IMPACT OF A VOCATIONAL EXPERT'S TESTIMONY WHEN PAIN OR OTHER SUBJECTIVE SYMPTOMS ARE INVOLVED

It is common for a vocational expert ("VE") to testify at a claimant's hearing before an ALJ, and in many cases such testimony is required. The VE is typically asked whether the claimant can perform his past relevant work or other jobs that

exist in significant numbers withing the national economy based upon hypothetical questions about the claimant's abilities in spite of his impairments. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

If the claimant is unable to perform his prior relevant work the burden shifts to the Commissioner to establish that he can perform other work. In such cases, if the vocational expert testimony upon which the ALJ relies is based upon a hypothetical question that does not take into account all of the claimant's impairments, the Commissioner has not met that burden, and the action should be reversed with instructions that the plaintiff be awarded the benefits claimed. This is so even if no other hypothetical question is posed to the VE. See Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1280 (9th Cir. 1987)(noting that when the burden is on the Commissioner to show the claimant can do other work, the claimant is not obligated to pose hypothetical questions in order to prevail). However, it is desirable for the VE to be asked whether the claimant can perform any jobs if his subjective testimony is credited. Such a hypothetical question would allow disability claims to be expedited in cases in which the ALJ's refusal to credit the plaintiff's pain testimony is found not to be supported by substantial evidence.

In Varney v. Secretary of Health and Human Services, 859 F.2d 1396 (9th Cir. 1987), the Ninth Circuit adopted the Eleventh Circuit rule which holds that if the

articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence, that testimony is accepted as true as a matter of law. Id at 1401. The court noted that "[a]mong the most persuasive arguments supporting the rule is the need to expedite disability claims." Id. If the VE is asked whether the claimant could perform other jobs if his testimony of pain or other subjective symptoms is accepted as true, the case might be in a posture that would avoid the necessity of a remand. As Varney recognized, if the VE testifies the claimant can perform no jobs if his pain testimony is accepted as true, the only relevant issue would be whether that testimony was properly discredited. Id.

## DISCUSSION

In his decision, the ALJ found that the plaintiff suffered from severe rheumatoid arthritis. [R. 20]. However, he found that the plaintiff's impairment "does not meet or medically equal on the of the listed impairments . . . ." [Id.]. The plaintiff was 51 years old at the time of the ALJ hearing. [R. 13]. A summary of the plaintiff's relevant treatment records follows.

Upon referral from his primary care physician, L. James Hoover, M.D., the plaintiff was seen by Warren D. Blackburn, Jr., a rheumatologist. On November 8, 2000, Dr. Blackburn noted:

> Overall, however, he has done quite well. He noticed on occasion that he would have swelling of one or two joints. Typically this joint is in the hand or perhaps the knee. In general this will last for a couple of days then resolve.

> He has contracture involving the right elbow. There is decreased range of motion in the wrists bilaterally. There is no peripheral synovitis. Except as above, PIP, DIP, wrists, elbows, shoulders, hips, ankles and MTP demonstrate no swelling, tenderness, laxity, deformity, and with normal range of motion and normal strength.
>
> Overall, I think he continues to do very well and is stable on a relatively non-toxic regimen.

[R. 230]. On April 10, 2001, the plaintiff returned for a follow up:

> [O]ver the last several visits he has had some increments [sic] in terms of the number of swollen and tender joints. In addition to this, over the last three weeks, he has noticed increasing pain in many of the peripheral joints, but in particular the elbows, knees, and hands. He has had several hours of morning stiffness. The flare has indeed interfered with his activity of daily living.

[R. 226]. The plaintiff's peripheral joints were essentially unchanged. [Id.]. "Overall," Dr. Blackburn said, "I think it has become clear that he is indeed having a flare of his rheumatoid arthritis." He suggested the plaintiff begin taking Methotrexate[1], and to follow up in six weeks to assess the response. [Id.].

On May 16, 2001, the plaintiff returned to Dr. Blackburn. "He overall thinks he might be somewhat better." [R. 223]. Dr. Blackburn noted that the plaintiff "indicates that he is still having some pain in his hands but the swelling has indeed

---

[1] "[A] folic acid antagonist that acts by inhibiting the synthesis of DNA, RNA, thymidylate, and protein; used as an antineoplastic in the treatment of a wide variety of malignancies, including acute lymphocytic, meningeal, and acute myelocytic leukemia; gestational choriocarcinoma; chorioadenoma destruens; hydatidiform mole; carcinoma of the breast, lung, and head and neck; non-Hodgkins lymphoma; mycosis fungoides; and osteosarcoma; administered orally. <u>It is also used as an</u> antipsoriatic and <u>antirheumatic in the treatment of</u> severe, recalcitrant, disabling psoriasis, <u>severe rheumatoid and psoriatic arthritis</u>, and dermatomyositis." Dorland's Illustrated Medical Dictionary 1029 (28th Ed. 1994).(emphasis added)

7

improved. His morning stiffness still lasts for several hours." [Id.]. Again, the plaintiff's peripheral joints were essentially unchanged, and Dr. Blackburn opined, "Overall, I think he is indeed improved." [Id.].

On June 26, 2001, Dr. Blackburn noted that the plaintiff had been taking Methotrexate for two months "and is doing remarkably better. He is having no morning stiffness. He is having no joint swelling." [R. 217]. "Overall, I think he is doing extraordinarily well." [Id.]. The plaintiff was to maintain his Methotrexate and prednisone regimen. [Id.].

On December 18, 2001, Dr. Blackburn said the plaintiff:

> is generally doing well on the Methotrexate and tolerating it without [side effects]. His main problem continues to be the right elbow and occasionally the right shoulder. There is marked limitation of range of motion in that shoulder which has not changed. There is no redness or swelling in the elbow or shoulder. He is stiff for less than 30 minutes every morning.
>
> He has decreased range of motion fo the wrists, left greater than right. There is a 20° contracture of the right elbow. Except as above, PIP, DIP, wrists, elbows, shoulders, hips, ankles and MTP demonstrate no swelling, tenderness, laxity, deformity, and with normal range of motion and normal strength.

[R. 209]. "Overall, I think he is under good control in terms of his rheumatoid arthritis." [Id.].

On May 1, 2002, the plaintiff returned to Dr. Blackburn for a follow up. "Overall, he has been doing reasonably well since his last visit. He continues to tolerate his Methotrexate without [side effects]," Dr. Blackburn said. [R. 200]. However, "[h]e did work out in the yard a lot more over the last couple of days and is now paying for it

8

with some increasing pain in the elbows." [Id.]. "Overall, I think his rheumatoid arthritis is under fairly good control." [Id.].

On August 13, 2002, Dr. Blackburn noted:

> Since his last visit, he has noticed that he has had increasing pain particularly over the last four weeks. He has noticed that he has indeed done considerably more particularly with his hands during that time and notes that after he does work that the pain is indeed somewhat worse. He has tolerated Methotrexate without [side effects]. Apart from this where he has done more with his hands, he really has not had any associated joint pain or swelling.

[R. 199]. Dr. Blackburn found "bony changes of the wrists with decreased range of motion," and a 20 degree contracture of the plaintiff's right elbow. [Id.].

On November 13, 2002, the plaintiff's condition was essentially unchanged. [R. 198]. "Overall, I think he is doing very well and we will maintain his present medication," Dr. Blackburn said. "We have reviewed his blood work and there is [sic] no significant abnormalities there." [Id.]. The plaintiff returned to Dr. Blackburn on February 19, 2003. Dr. Blackburn noted, "He is still having pain in multiple joints. This is however, unassociated with redness or swelling, and with less than 30 minutes of morning stiffness." [R. 275]. "Apart from the pain, which has responded to by decreasing his activity, he has been basically stable." [Id.]. "Overall, I think his [rheumatoid arthritis] is actually under fairly good control." [Id.]. The plaintiff was to maintain his current regimen. As for the plaintiff's pain, Dr. Blackburn "indicated to him again that the pain is most likely related to mechanical changes." [Id.].

On July 23, 2003, the plaintiff indicated to Dr. Blackburn that "he is overall doing okay and feels that with the warmer weather that he has not had a much [sic] problems." [R. 274]. Dr. Blackburn noted, "He has had no particular joint problems," and opined that the plaintiff's rheumatoid arthritis was again "under reasonably good control at the present time." [Id.].

On September 24, 2003, the plaintiff was seen by David J. Dueland, M.D., for a consultative orthopedic evaluation:

> Mr. Crumbley is a 49-year-old gentleman who since 1990 has carried the diagnosis of rheumatoid arthritis. His elbow is most affected followed by his knee and shoulders. Some involvement of his fingers is present. He did have significant problems in his wrist previously with some loss of motion. His biggest complaint is the inability to reach his head and face, etc.
>
> Patient has limitations in right elbow motion. He has 30 to 90 degree motion with 70 degrees of supination and 90 degrees of pronation. The left elbow has 15 to 115 degree range of motion with 80 degrees of supination and 90 degrees of pronation. Some moderate crepitus is felt throughout range of motion; fullness is noted on the soft spot.
>
> AP and lateral x-rays show significant osteophyte formation. There appears to be a probable mechanical block with what looks like to be about 100 to 105 degrees of flexion. Significant spurring is present with joint space narrowing. [246]

[R. 246]. Dr. Dueland suggested therapy to assist the plaintiff with eating, brushing teeth, and combing hair, but thought that arthroscopic synovectomy and joint replacement was not indicated. [R. 247].

Dr. Blackburn continued his treatment of the plaintiff on October 28, 2003. "Overall, he is doing very well and has continued to tolerate" his medications without

side effects, Dr. Blackburn reported. [R. 273]. "He has been doing some exercises for the shoulder and that has been helpful for him." [Id.]. "I think he is doing remarkably well," Dr. Blackburn said. [Id.]. The plaintiff returned on January 28, 2004. Again, Dr. Blackburn noted, "Overall he has done very well since his last visit. He has had very little joint pain." [R. 272]. "Overall, I think his arthritis is indeed under good control." [R. 272].

On February 18, 2004, the plaintiff was seen by Dr. Blackburn:

> early because he had a flare of his right knee. He did note that it was worsen [sic] after using it extensively and felt for a period of a day or two that he was unable to ambulate. However, today it has improved considerably but comes now for evaluation anyway. He still has no redness.

[R. 271]. "There is mild synovitis and swelling involving the right knee," Dr. Blackburn noted. "Overall, I think he probably is having a very mild flare. In light of that, I have suggested in increasing the Prednisone to 5 mg." [Id.]. In a return visit on April 28, 2004, Dr. Blackburn opined the plaintiff continued to do very well. [R. 270].

However, on July 28, 2004, the plaintiff's condition was much worse. The plaintiff reported pain, "particularly in his shoulders and hands. This has been associated with little joint swelling." [R. 269]. Dr. Blackburn noted:

> he is having increasing difficulty with any of his activities of daily living. In particular because of limited range of motion in the hands. He has problems dressing himself such as pulling on shoes and socks, and combing his hair. He is unable to get in and out of the bath tub and has trouble getting on and off the toilet. Buttons are somewhat difficult as well. He thinks he is unable to perform any meaningful [employment] at the present time.

> There is marked limitation of the range of motion of the wrists, elbows, as well as MCPs. He has contractures in the elbows. There is no synovitis. There is crepitus involving the left shoulder.

[R. 269]. On August 2, 2004, Dr. Blackburn completed a functional capacity assessment, in which he estimated the plaintiff was capable of lifting less than 10 pounds because of joint deformities, especially in the plaintiff's wrist and hands. [R. 288]. Dr. Blackburn also opined that the plaintiff was capable of standing and walking about one hour in an eight-hour workday because of arthritis in his feet and knees. [Id.]. Dr. Blackburn noted that the plaintiff's arthritis limits his ability to dress himself. [R. 290].

In his decision, ALJ Cates noted, "Doctor Blackburn's records indicate that the claimant's arthritis is under good control." [R. 18]. For the vast majority of Dr. Blackburn's treatment records as noted above, this is an accurate statement. However, this statement becomes inaccurate in light of Dr. Blackburn's July 28, 2004, treatment records and his August 2, 2004, functional capacity assessment. The ALJ failed to credit Dr. Blackburn's testimony at this point, "as it is not consistent with the claimant's medical records or with the claimant's testimony." [Id.].

Because Dr. Blackburn is a specialist in the field of rheumatology, his opinion is entitled to more weight in this area.[2] It is clear that while Dr. Blackburn's treatment records indicate the plaintiff's rheumatoid arthritis was under good control. It is also clear that by July 28, 2004, the plaintiff was unable to accomplish basic activities

---

[2] "We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a medical specialist." 20 C.F.R. § 404.1527(d)5)

12

of daily living, such as bathing, dressing and attending to his toilet needs.  The ALJ's reasons for refuting Dr. Blackburn's testimony as of July 28, 2004, are not supported by substantial evidence.  As such, his testimony must be taken as true.  The ALJ's finding that the plaintiff has the residual functional capacity to perform a significant range of light work as of July 28, 2004, is not supported by substantial evidence.

      The consultative Physical Capacities Evaluation, relied on by the ALJ, included a limitation on gross manipulation or handling.  [R. 241].  This limitation was not included in the ALJ's hypothetical questions to the VE, but would certainly be relevant to the counter clerk, parking lot attendant and cashier jobs the ALJ found the plaintiff could perform in the light category.  The ALJ used GRID Rule 202.14 as a framework for his finding of "not disabled."  [R. 21].  This rule is used for a person closely approaching advanced age, with a high school education, and with work experience that is skilled or semi-skilled without transferrable skills.  Taking Dr. Blackburn's testimony as true, the plaintiff would have at best been limited to sedentary work, and the GRIDS would have dictated a finding of "disabled."  20 C.F.R. Part 404, Subpart P, App.2, Rule 201.14.

## CONCLUSION

      Therefore, the Commissioner failed to carry his burden at step five of showing the plaintiff could perform other work.  Accordingly, the plaintiff, as of July 24, 2004, is disabled within the meaning of the Social Security Act.  An appropriate order

remanding the action with instructions that the plaintiff be awarded the benefits claimed as of July 24, 2004, will be entered contemporaneously herewith.

jDONE and ORDERED 19 September 2008.

                                        UNITED STATES DISTRICT JUDGE
                                                J. FOY GUIN, JR.